J-A13043-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| KARYN NILES | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| ZACHARY OOSTERKAMP | : | No. 1567 WDA 2024 |

Appeal from the Order Entered November 18, 2024
In the Court of Common Pleas of Erie County
Civil Division at No. 12226 of 2018

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                **FILED: JULY 10, 2025**

Karyn Niles (Mother) appeals from the order denying her petition to modify physical custody of the two children, C. and D. (collectively, Children), born to Mother and Zachary Oosterkamp (Father).  After careful review, we affirm.

Factual and Procedural History

C., age 14, was born in 2011, and D., age 12, was born in 2013.  The trial court explained:

> The parties remain legally married but have been separated since 2018-2019.  At the time of separation, Mother had primary physical custody of [C]hildren.  However, the custody … changed upon Mother's move to Titusville, Pennsylvania, at or around 2020[, when the parties agreed to Father having primary physical custody so Children could attend school in the Corry School District].  [On] August 3rd, 2022[, the parties formalized their agreement by consenting to an order which] states that [C]hildren are to reside with Father, with Mother granted partial custody

between Fridays at 4:30PM or 5:00PM, until Monday[,] when [C]hildren return to school in the Corry School District, or "until between 4:30PM and 5:00PM if there is no school." *See* Order of Court, [8/3/22] (Docket No. 12226-2018). The parties "alternate seven (7) day periods of custody" during the summer when there is no school. *Id.*

[T]his schedule kept [C]hildren in the Corry School District as opposed to Titusville schools, which was more beneficial for [C]hildren's education. Mother has since returned to Corry, Pennsylvania, and now lives within the Corry School District again.

Trial Court Opinion (TCO I), 11/18/24, at 1-2.

Mother moved back to Corry in May 2024. In July 2024, she filed a petition to modify custody. Mother sought equally shared physical custody, "by having the alternating-seven-days schedule apply to the entire calendar year." *Id.* at 2.

A custody trial was held on November 7, 2024.[1] Mother and Father were the only witnesses. Prior to hearing the parties' testimony, the trial court stated that its "inquiry is the best interest of the child, basically in conjunction with analyzing [statutory] factors."[2] N.T., 11/7/24, at 3. The court also stated, "I want to know why the 2022 order should be changed." *Id.*; *see also J.M.R. v. J.M.*, 1 A.3d 902, 911 (Pa. Super. 2010) (reiterating that a party seeking to modify custody has the burden to show that modification serves the child's best interest).

_____

[1] Mother was represented by counsel and Father appeared *pro se*. Both parties are represented on appeal.

[2] The trial court extended the 16 statutory factors to 18 by separately numbering two subsections of the second factor involving abuse. *See* TCO I at 4-9; 23 Pa.C.S. § 5328(a)(1)-(16).

*Mother*

Mother testified about returning to Corry, where she lives with her boyfriend and their infant son, who was born in August 2024. N.T. at 5. Mother stated that she moved back to Corry "with the intent of having the kids 50/50." *Id.* at 13. She confirmed that she previously lived in the Titusville School District, which "wasn't a good fit" for Children. *Id.* at 8. Thus, in 2020, Mother agreed to Father having primary physical custody during the school year. *Id.* Mother explained that Children "have friends and do extracurricular activities in Corry[, and] I like them being in the Corry School District. That's why we moved there." *Id.* at 19. Mother noted that C. is involved in cheerleading and D. plays soccer. *Id.* at 13.

Mother testified that she has been with her boyfriend for a year and a half, and that Children have a good relationship with him. *Id.* at 5, 14. She relayed that they go shopping, take walks, and watch movies together. *Id.* at 14. Mother also testified that Children love their new step-brother, and are close with Mother's extended family, which includes Children's grandparents and cousins. *Id.* at 9, 15.

Mother stated that she "would like week on/week off [custody] like it is in the summer." *Id.* at 9. When Mother's counsel asked her why she was requesting the modification, Mother answered:

> I just think it will be better for the kids and I'd like to have more time with them during the week instead of just weekend time. I'd like to be more involved with their schooling because they seem

- 3 -

> to be struggling a little bit in that department and [I could] give
> them a little bit more structure.
>
> ***
>
> I think they'll just have a little bit more structure. I'll be able to
> be involved in and help them with their schoolwork because that's
> been an issue and [I could] keep a little closer tabs on them….

*Id.* at 9-10. Mother expressed concern with Father not helping Children with schoolwork, and said Father "doesn't do a lot of communicating" with her. *Id.* at 10-11. Mother stated that she and Father communicate by text, although "he tends to not answer a lot." *Id.* at 20.

Mother is employed as an assistant director of a daycare in Erie. *Id.* at 16-17. She works five days a week, Monday through Friday, from 6:20 a.m. to 3:00 p.m. *Id.* at 16. Mother stated that when she has custody of Children on work days, "we have alarms and a routine set in place that they can get themselves up and get ready and get on the bus." *Id.* at 17.

Mother testified that she and Father both buy clothes for Children, and share responsibility for transporting Children to appointments and activities. *Id.* at 13. Regarding doctor and dental appointments, Mother explained that she schedules the appointments and Father takes Children to the appointments. *Id.* at 20. She stated that with Father not working, "I don't feel like I should have to lose … money [by missing] work to take [Children] when he's able to." *Id.*

Mother expressed concern with Father's marijuana use. She stated:

> He's smoked as long as I've known him. And I used to smoke
> with him, but I do not smoke anymore. My concern is that it's

- 4 -

kind of open in front of [Children]. The house smells like weed pretty much, and it's done in front of [Children]. And he travels with them to get his supply, I guess, would be the term.

*Id.* at 12. Mother testified that she stopped using marijuana in 2023. *Id.* at 23. Mother also testified to "having a problem" with Adderall, which she stopped using in 2020. *Id.* at 22-23. Mother stated that she had been sober and drug-free for "[a]bout a year." *Id.* at 23.

As Father was self-represented, he questioned Mother on cross-examination about the custody schedule she "followed, not what the court order says." *Id.* at 24. Mother responded that before moving to Corry, she returned Children to Father on Sundays rather than Mondays because "it wasn't feasible for me to get from Centerville to Corry to Union City by 6:30 in the morning." *Id.* at 25.

*Father*

Father asked the trial court if he could read "a written statement of basically my view." *Id.* at 27. With the court's permission, Father stated:

I'm requesting the custody agreement to be … the schedule we have been following…. I … drop the kids off Friday after school between 6 p.m. and 8 p.m. [Mother] has the kids until Sunday … and returns them before 8 p.m.

I'm asking for holidays to be 50/50 discretion advised by the [c]ourt. [Mother] was adamant about having the Monday [custody] on the previous court order and they put it down and then she followed [it] for about a month. And now that she lives in Corry, she began following it again this school year.

*Id.* at 28.

Father stated that he is not employed, but "gets paid disability through" the Veterans Administration (VA).[3]  *Id.* at 31.  Father also receives Supplemental Nutrition Assistance Program (SNAP) benefits.  *Id.*  He testified that his income of approximately $2,000 a month is sufficient to support himself and Children.  *Id.* at 40, 42.

Father described Children's weekday routine as starting at "6:30, 6:45 [when Children] wake up."  *Id.* at 41.  Father stated:

> If they need a shower, they'll jump in the shower or grab something like a light breakfast.  They normally eat at school. They'll sit around the house until about 7:20, the bus arrives, they jump on the bus and go to school.  [Around] 3:30[,] they return home.   My  daughter  right  now,  she  currently  attends cheerleading, so I pick her up at 5:15.
>
> [My son] gets dropped off at 3:20 at the house from the bus after school.  And then we just normally hang out and sometimes we'll go [somewhere]….

*Id.*

Father explained that for the past four years, he and Children had been living in a house owned by his father.  *Id.* at 30.  Because Father's father passed away three months prior to trial, an estate was opened, and Father expected that the house would be sold and he will have to move.  *Id.* at 31. Father testified that he was exploring options with housing assistance and programs for veterans.  *Id.* at 32-33.  In response to questioning by the trial court, he confirmed that he and Children had lived in the home for four years,

---

[3] Father stated he was not receiving social security disability because when he inquired, "they told me I make too much."  *Id.* at 32.

but would likely be moving. *Id.* at 39. Father stated that he was "going to be there [for] the next several months," and "hopefully I'm out within months, but I'm not 100 percent sure, Your Honor." *Id.*

With respect to custody, Father testified that he had "no problem" with Mother having Children for a "week on/week off" during the summer. *Id.* at 34. However, Father stated that he did not want to "disrupt what we have in place" during the school year. *Id.* Father noted logistical challenges, including transportation, and stated that Children would "have to remember … to jump on this bus this week and this bus that week." *Id.* He recognized that Mother "believes leaving them at home [alone] isn't too difficult for them," but stated, "it's just easier on them to continue what we have in place." *Id.* at 34-35. Father responded to the following questions from Mother's counsel:

> Q.    And you think you're a better parent to raise [C]hildren than [M]other is[?]  You don't think [C]hildren should go over there during the school year[?]
>
> A.    I'm not saying that.  I just said that I believe that the schedule should remain the same and there's no point in changing it.

*Id.* at 37.

As to marijuana, Father corroborated Mother's testimony that he uses marijuana and does so in front of Children. *Id.* at 35. Father explained that marijuana "replaced three different pharmaceutical medications that I was prescribed." *Id.* at 36. Father does not have a medical certification to purchase marijuana in Pennsylvania. *Id.* He testified that he drives from Erie

County to New York, where marijuana is sold legally for recreational use. *Id.* Father explained: "I use it medically, but I'm saying that New York considers it recreational use. And in Pennsylvania, you have to pay to get a certification to purchase." *Id.*

*Trial Court Disposition*

After hearing the evidence, the trial court advised the parties that it would review the testimony before making a decision. *Id.* at 45. Approximately one week later, the court issued an order stating, "[U]pon consideration of the custody factors set forth in 23 Pa.C.S. § 5328, as set forth in the accompanying [o]pinion, and in the best interest of the parties' minor [C]hildren," the August 3, 2022 custody order "shall remain *status quo*." Order, 11/18/24. Notably, the court added the caveat that "Father shall not purchase or utilize marijuana in the presence of [C]hildren." *Id.*

Mother filed a timely notice of appeal and Pa.R.A.P. 1925(a)(2)(i) concise statement. On January 14, 2025, the trial court issued a supplemental opinion (TCO II). Mother presents the following issues for review:

> 1. Whether the [trial c]ourt erred and abused its discretion in failing to award Mother 50/50 custody of [C]hildren where her testimony demonstrated she is more likely: to ensure the safety of [C]hildren; to perform parental duties for [C]hildren; to provide stability and continuity in [C]hildren's education, family life and community life; to have an available extended family; to facilitate [C]hildren's sibling relationships; to maintain a loving, stable, consistent and nurturing relationship with [C]hildren adequate for the[ir] emotional needs; and more likely to attend to the daily, physical, emotional, developmental, educational, and special needs of [C]hildren[?] *See* 23 Pa.C.S. § 5323; 23 Pa.C.S. § 5328.

2. Whether the [trial c]ourt failed to consider Father's excessive marijuana use around the presence of … Children in failing to award Mother a 50/50 custody order[?] **See** 23 Pa.C.S. § 5323; 23 Pa.C.S. § 5328.

Mother's Brief at 5.

Discussion

*Established Law*

The Child Custody Act provides that upon petition, "a court may modify a custody order to serve the best interest of the child." 23 Pa.C.S. § 5338(a). "The party seeking modification … has the burden to show that modification is in the child's best interest." **J.M.R.**, 1 A.3d at 911 (citation omitted).

When ordering any form of custody, the trial court must consider the enumerated factors set forth in Section 5328(a)(1)-(16). The court "shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child." 23 Pa.C.S. § 5328(a). In addition, the court must explain the reasons for its decision "on the record or in a written opinion." **See S.W.D. v. S.A.R.**, 96 A.3d 396, 401 (Pa. Super. 2014). **See also** 23 Pa.C.S. § 5323(d) (providing that the court "delineate the reasons for its decision on the record in open court or in a written opinion or order"). There is "no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." **M.J.M. v. M.L.G.**, 63 A.3d 331, 336 (Pa. Super. 2013).

As an appellate court, this Court must defer to the trial court unless "the custody order is manifestly unreasonable as shown by the evidence of record." **Saintz v. Rinker**, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted). The law is settled:

> We review custody orders for an abuse of discretion. We will not find such an abuse merely because we would have reached a different conclusion. Rather, an abuse of discretion occurs only if the trial court overrode or misapplied the law in reaching its conclusion, or the record shows the trial court's judgment was manifestly unreasonable or the product of partiality, prejudice, bias, or ill will.
>
> Moreover, our scope of review is broad. Because this Court does not make independent factual determinations, we must accept findings of the trial court that are supported by competent evidence of record. Importantly, we defer to the trial court on matters of credibility and weight of the evidence, as the trial court viewed and assessed witnesses firsthand. We are not, however, bound by the trial court's deductions or inferences. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**Taylor v. Smith**, 302 A.3d 203, 206–07 (Pa. Super. 2023) (citations and quotation marks omitted). It "is not this Court's function to determine whether the trial court reached the 'right' decision," as we must give "due deference to the trial court's weight and credibility determinations." **Id.** at 207 (citations omitted).

*Mother's Issues*

In both issues, Mother asserts the trial court erred and abused its discretion in weighing and applying the evidence to the custody factors.

- 10 -

1. *Custody Factors Involving Children's Safety, Stability, Education, Family and Community Life, and Parental Duties*

In her first issue, Mother acknowledges the trial court's analysis of the custody factors, but contends the "court's conclusions are not supported by the record." Mother's Brief at 18. Mother emphasizes Children's safety, stability, education, family, and community life, as well as the parties' parenting duties. Mother argues:

> Father provided the [c]ourt with no evidence or testimony regarding the role he plays for Children under several of the custody factors. Specifically, Father provided no testimony regarding what he does to ensure the safety of the children (Factor 1), the availability of extended families (Factor 5), his ability to maintain a loving, stable and nurturing relationship with [C]hildren (Factor 9), his ability to attend to Children's daily needs (Factor 10), and his ability to make child-care arrangements (Factor 12).

*Id.* at 20.

Mother does not dispute the evidence, and recounts both parties' testimony to argue how the court "should have ruled." *Id.* For example, although Mother addresses Father's marijuana use exclusively in her second issue, she asserts in this first issue that the court "should not have deemed Factor 1[, regarding the party more likely to ensure the child's safety,] as a neutral factor, as Father testified that he engages in illegal activity that includes Children when he travels out-of-state to purchase marijuana." *Id.*

Mother contends the court "should have ruled that this factor favors Mother."[4] *Id.* Overall, Mother maintains "the totality of the evidence … does not support the court's conclusion that the best interest of Children is to continue with the 2022 custody order between the parties." *Id.* at 24.

It was Mother's burden, as petitioner, to prove that modification was in Children's best interest. *See J.M.R.*, 1 A.3d at 911. Mother fails to acknowledge that "parties cannot dictate the amount of weight the trial court places on evidence." *Smith v. Smith*, 281 A.3d 304, 312 (Pa. Super. 2022). As Father stresses, "it was solely in the discretion of the trial court … to weigh the applicable custody factors." Father's Brief at 9 (citing *M.J.M.*, 63 A.3d at 336). Father argues that the trial court did not err or abuse its discretion because the record supports the court's findings and conclusions. We agree.

The trial court addressed the custody factors in the opinion it issued with its order.[5] TCO I at 4-9. The court found all but two factors were "neutral" — it concluded that Children's need for stability and continuity "slightly favors

---

[4] Mother does not address her own marijuana use, and does not claim that Father's marijuana use impacts his parenting. In focusing on Father buying marijuana in New York, Mother disregards that Father obtains marijuana from a legal source; in focusing on Children's exposure to Father's marijuana-related activity, Mother disregards that the court ordered Father to "not utilize or purchase marijuana in the presence of [C]hildren." Order, 11/18/24.

[5] As noted above, the court listed 18 factors, re-numbering factor 2.2 (violent or assaultive behavior committed by a party) as factor 3, and factor 2.3 (which party is more likely to encourage and permit frequent and continuing contact … if contact is consistent with the safety needs of the child) as factor 4. *See* TCO I at 4.

Father," while the availability of extended family "slightly favors Mother." *Id.*

at 5-6. The court addressed factors 1 through 10 as follows:

**1 Which Party is More Likely to Ensure the Safety of the Child**

This factor is neutral. As both parents have had periods of primary custody, and no relevant concerns for [C]hildren's safety have been presented to the [c]ourt, the [c]ourt therefore finds both parties able to ensure the safety of [C]hildren.

**2 Present and Past Abuse Committed by a Party or Member of the Party's Household**

This factor is neutral, as neither party testified to any abuse of [C]hildren. Therefore, the [c]ourt finds this factor does not affect the custody decision.

**[2.2] Violent or Assaultive Behavior Committed by a Party**

This factor is neutral. The parties provided no testimony that any such behavior has occurred.

**[2.3] Party More Likely to Encourage and Permit Frequent and Continuing Contact Between Child and Another Party, If Consistent with Safety Needs of the Child**

This factor is neutral. Though primary custody has changed between the parties, no testimony was provided that either party has intentionally withheld [C]hildren from the other. Father noted in his testimony that Mother, while the August 2022 order permitted her to have custody of the kids until "Monday when [C]hildren return to school," would return [C]hildren on Sundays and not avail herself of the Monday custody. *See* Order of Court, [8/3/22] (Docket No. 12226-2418). This practice continued until Mother returned to Corry, Pennsylvania, and filed the Modification Petition on July [22], 2024.

Mother testified that Father is generally uncommunicative, causing a lack of significant discussions about custody prior to the November 7th trial. Father testified that Mother responds intermittently to texts and that he learned of the trial date via the children arguing about information they had received from Mother. Though the parties have displayed communication issues,

[C]hildren continued to be exchanged normally under both custody formulations. Therefore, the [c]ourt finds this factor does not benefit or detract from either party.

## [3] Parental Duties Performed by Each Party

This factor is neutral; both parties have shown and testified to the ability to meet [C]hildren's primary needs. Therefore, this factor does not affect the custody decision.

## [4] Child's Need for Stability and Continuity

This factor slightly favors Father. [C]hildren have been operating under the 2022 custody schedule for the last four (4) years, and both parties have been able to adequately meet [C]hildren's needs under this schedule. At present, [C]hildren are normally attending school at Corry School District and are involved in extracurricular activities. While Mother has testified that [C]hildren are struggling in school and would benefit from greater structure in their routines, the current custody schedule has proven sufficient to foster this stability. Therefore, the [c]ourt finds that the current [o]rder's schedule is sufficient to satisfy this factor.

## [5] Availability of Extended Family

This factor slightly favors Mother. Mother testified that [C]hildren have a relationship with her step-father and mother ([C]hildren's grandparents), as well as an established relationship with Mother's sister and cousins. Father testified that his father passed away in the preceding three months. Due to availability, the [c]ourt finds this factor slightly favors Mother.

## [6] Sibling Relationships

This factor is neutral. [C]hildren have a half-brother, born [i]n August … 2024, to Mother and her boyfriend…. Mother testified that the relationship between Children and the half-brother has been positive. The [c]ourt therefore finds that the current custody schedule provides stability for [C]hildren and is sufficient to maintain their relationship with their half-brother.

## [7] Preference of the Child

This is not a factor, as [C]hildren were not offered for testimony in the custody trial.

**[8] Attempts to Turn the Child Against the Other Party**

This factor is neutral. Neither party presented evidence suggesting the other party was engaging in such activity. Therefore, the [c]ourt finds this factor does not affect the custody decision.

**[9] Party More Likely to Maintain Loving, Stable, Consistent, Nurturing Relationship Adequate for the Child's Emotional Needs**

This factor is neutral. From Mother and Father's testimony, both are maintaining relationships with [C]hildren sufficient to meet these needs under the current custody order.

**[10] Party More Likely to Attend to the Daily Physical, Emotional, Developmental, Educational, and Special Needs of the Child**

This factor is neutral. Both parties have proven that, under the 2022 [o]rder, [C]hildren's needs in these regards are being sufficiently met. Mother is currently employed as an assistant director for [a] [c]hildcare [c]enter…, and testified that her boyfriend … is an independent welder. Father is not employed, but is receiving $1[,]200 per month from Veterans Affairs and $720 per month from the Supplemental Nutrition Assistance Program (SNAP). From given testimony, both parties' dwellings are sufficient to raise [C]hildren safely.

*Id.* at 4-7. The trial court also found the remaining six factors — (11) proximity of residences; (12) availability to care for children or arrange childcare; (13) level of conflict; (14) history of drug or alcohol abuse; (15) mental and physical condition; and (16) any other relevant factors — to be neutral. *Id.* at 7-9. In the final factor, "any other relevant factors," the court addressed Father's housing, noting that "this case may require a modification next year if, and when, Father moves from his residence." *Id.* at 9; 23 Pa.C.S. § 5328(a)(16).

- 15 -

The record supports the trial court's conclusions. As Father states, with "one factor favoring Mother and one favoring Father, it [wa]s up to the trial court to weigh the evidence." Father's Brief at 16. The court expanded on its reasoning:

Mother's own living arrangements are new[,] along with the family dynamic that now includes a baby…. Major changes such as these do not favor stability and continuity on Mother's part.

By comparison, Father has been living at his residence in Corry for over four (4) years. [H]is father … passed away three (3) months before the custody trial. An estate will be opened and the house probably [will be] sold at some point. In the meantime, he will continue to live at the house with [C]hildren as they have done the last four (4) years. [C]hildren have their own bedrooms and the rest of the house to live in. No other children live there. Most importantly, the house provides the stability for [C]hildren that they have known the last four (4) years.

A potential move date is unknown at this point and the [c]ourt cannot speculate on Father's future residence as this has not yet occurred. Mother believes that the uncertainty with Father's next residence somehow favors her. However, Mother's position in this regard lacks merit. She had only lived in Corry for six (6) months prior to the trial on November 7, 2024. This does not demonstrate stability. Conversely, Father lived in Corry for over four (4) years in the same house where [C]hildren have attended school. …

Further, [C]hildren have been accustomed to living in Father's residence during the school week. He has been responsible for ensuring school attendance and also picks them up from extracurricular activities. When Father was asked by Mother's counsel if it wouldn't be easier to alternate weeks during the school year, Father answered no[,] and had a simple reason [that s]uch change would "disrupt" [C]hildren's school year schedule and change their bus routes every week[, and k]eeping the same schedule would make it "easier" for the kids. Father's responses demonstrated an understanding of, and attention to, [C]hildren's daily developmental and educational needs. Mother's testimony did not address the impact that changing the school year schedule would have on [C]hildren. … Mother simply argues that she

should resume a 50/50 custody arrangement after four (4) years since she has now moved to Corry. This illustrates a lack of understanding by Mother of how her proposed change could adversely affect [C]hildren's need for stability and continuity in their education.

TCO II at 3-5 (citations to notes of testimony omitted).

For the reasons discussed above, the trial court did not err or abuse its discretion in considering Children's safety, stability, education, family and community life, as well as parental duties, in its analysis of the custody factors.

2. *Father's Marijuana Use*

In her second issue, Mother challenges the trial court's consideration of Father's marijuana use. The custody factors include the "history of drug or alcohol abuse of a party or member of a party's household." 23 Pa.C.S. § 5328(a)(14). Mother claims the court "erred in failing to consider Father's illicit and illegal marijuana use when fashioning the custody opinion and order." Mother's Brief at 25.

Father counters that the trial court "clearly and directly considered and addressed Father's marijuana use in its decision." Father's Brief at 17. Father states:

> The [c]ourt considered the testimony that Father uses marijuana to help his depression and anxiety[,] and the testimony that Father has used the substance with [C]hildren present. The [c]ourt carefully weighed Father's marijuana use with Mother's past marijuana and Adderall use and found the factor to be neutral. To address Mother's concerns, the [c]ourt placed a provision in the November 18, 2024 [o]rder … specifically addressing Father's substance use.

> Mother's argument seems to be based on the flawed premise that, as the [c]ourt did not rule in her favor, then it must not have considered this factor. But that argument is contradictory to the clear language of both the [o]pinion and [o]rder…. The [c]ourt considered this factor and the testimony surrounding it. The [c]ourt was well within its discretion, even if another court may have weighed this factor differently.

*Id.* at 20 (footnotes citing notes of testimony omitted). We agree with Father.

Mother's argument does not accurately reflect the trial court's decision, and fails to recognize that Mother may not "dictate the amount of weight the trial court places on evidence." *Smith*, 281 A.3d at 312. The court addressed Father's marijuana use in the opinion it issued with its order. TCO I at 8. The court explained:

> Father testified to using marijuana purchased in New York State recreationally in his home. Father additionally testified to using marijuana in the presence of [C]hildren. Father testified that the use of marijuana helps treat his anxiety and depression, and he believes the marijuana is sufficient to replace three (3) prescribed pharmaceuticals for the same conditions. Mother testified that she previously used Adderall and marijuana, becoming sober from both in 2020 and 2023, respectively. Mother testified that the separation of the parties resulted from Mother's decision to seek rehabilitative care in 2018, a decision which placed [C]hildren in the care and primary custody of Father. Mother testified that she was willing to submit to court-ordered urinalysis, but this was not administered. Due to both parents' issues with substance abuse, the [c]ourt finds this factor neutral in the final analysis, though the [c]ourt has impressed and will subsequently order Father to cease marijuana use in the presence of [C]hildren.

*Id.*

The record supports the trial court's weighing of the evidence and conclusion that this factor was neutral. The two cases Mother cites do not persuade us otherwise.

First, Mother cites ***A.M.S. v. M.R.C.***, 70 A.3d 830 (Pa. Super. 2013), where the trial court granted the mother's request to relocate to New York with the parties' child. The mother planned to live with her sister and her sister's family. On appeal, the father claimed the court's "references" to the custody factors "were not adequate to show that the court considered those factors when making its decision and, at most, show that the court reflected on those factors later, in preparing its opinion." ***Id.*** at 836. This Court vacated the order because we agreed that the trial court failed to adequately consider factors involving drug abuse and physical and mental conditions. ***See*** 23 Pa.C.S. § 5328(a)(14)-(15). Mother cites ***A.M.S.*** in arguing:

> Similarly, in the case at bar, the trial court failed to address Father's marijuana use, where he admitted that he uses it recreationally, not medically, and he travels outside Pennsylvania to purchase the marijuana, and transport[s] it and possess[es] it illegally in the Commonwealth of Pennsylvania. Father further admitted to taking the Children with him to purchase the marijuana illegally and using the drug openly and in front of his children.

Mother's Brief at 27. Mother's argument lacks merit. As set forth above, the court addressed Father's marijuana use in the opinion it issued with its order. Further, the court ordered that "Father shall not purchase or utilize marijuana in the presence of [C]hildren." Order, 11/18/24.

We are also unconvinced by Mother's reliance on ***H.R. v. C.P.***, 224 A.3d 729 (Pa. Super. 2019). In ***H.R.***, the child was in the primary physical custody of his grandparents. ***Id.*** at 732. The mother and father had "struggle[d] with substance abuse, and [the f]ather's recreational use of marijuana ha[d] been

- 19 -

a recurring issue throughout the custody litigation." *Id.* at 731 (footnote omitted). The mother had "periods of physical custody for up to four hours on alternating weekends[, and the f]ather exercise[d] three hours of supervised visitation on alternating Saturdays." *Id.* at 732. The father petitioned to modify custody based on "a general assertion that the prevailing custody arrangement was contrary to [the child's] best interest." *Id.* at 733. He specifically claimed that "in light of his newly-acquired license to use medical marijuana as a mechanism to manage wrist pain, the trial court should not weigh the fact of his marijuana use against him." *Id.* "[The f]ather argued, 'Marijuana is now a state recognized medicine and shouldn't be used to keep children from parents.'" *Id.* (citation omitted).

The trial court denied relief in *H.R.*, finding, *inter alia*, that "it is unknown from the record what effect [the f]ather's alleged medical condition and use of marijuana, whether medically prescribed or used recreationally, may have on his ability to care for and parent the child." *Id.* at 734 (citation omitted). Thus, the court determined it was "not in the best interest of the child to expand [the f]ather's partial custody," and "it served child's best interests to continue with the prior custody arrangement." *Id.*

The father in *H.R.* appealed, claiming that the trial court erred by 1) ignoring his certification to use medical marijuana; and 2) relying on hearsay or unsubstantiated evidence to find that he abused marijuana. *Id.* at 734–35. This Court rejected both claims, as they were "predicated upon the faulty legal position that, upon demonstrating his certification to use medicinal

marijuana, the Medical Marijuana Act [(MMA), 35 P.S. §§ 10231.101-10231.2110,] barred the court from considering any aspect of its use in reaching the best interest determination." *Id.* at 736. We emphasized that the MMA "expressly reaffirms" the custody factors in Section 5328(a) as "the controlling mechanism for determining a child's best interest." *Id.* (citing 35 P.S. § 10231.2103(c) ("In determining the best interest of a child with respect to custody, the provisions of 23 Pa.C.S. Ch. 53 (relating to child custody) shall apply.")). We also noted the trial court's finding that no custody factors favored the father. *Id.* at 733 n.2. We explained:

> [T]he court examined [the f]ather's well-documented history of recreational drug use, including the allegations that [the f]ather laced [the child's] food with marijuana, incorporated those considerations into its best-interest determination, and concluded that it served [child's] best interests to employ the proven custody arrangement that had been in effect since 2012….

*Id.* at 736.

Here, Mother recounts our decision in *H.R.*, and repeats, "[s]imilarly, in the case at bar, the [trial c]ourt provided no analysis into Father's marijuana use, or his condition, before dismissing Father's marijuana use as a non-issue." Mother's Brief at 28-29. As we explained above, this claim is baseless.

Notably, *A.M.S.* and *H.R.* represent the little precedential case law discussing marijuana use by parents involved in custody disputes. We recognize that marijuana is illegal under the Federal Controlled Substances Act, 21 U.S.C. §§ 801-971. We also recognize that it is not this Court's function "to enunciate new precepts of law or to expand existing legal

- 21 -

doctrines." ***Bell v. Willis***, 80 A.3d 476, 479 (Pa. Super. 2013) (citation omitted). ***See also Lance v. Wyeth***, 85 A.3d 434, 454 (Pa. 2014) (stating that "the adjudicatory process does not translate readily into the field of broad-scale policymaking") (citations omitted); ***DeMuth v. Miller***, 652 A.2d 891, 900 n.4 (Pa. Super. 1995) (noting that the "altering of societal norms is a process which is incremental at best"). Nonetheless, we are mindful that the law and the public perception of marijuana use is evolving.

*Evolving Law*

In 2016, the General Assembly enacted the MMA to provide "'access to medical marijuana which balances the need of patients to have access to the latest treatments[,] with the need to promote patient safety' and to '[p]rovide a safe and effective method of delivery of medical marijuana to patients.'" ***Commonwealth v. Barr***, 266 A.3d 25, 41 (Pa. 2021) (citation omitted). Because of the MMA, marijuana is not "*per se* illegal in this Commonwealth." ***Id.***

In 2022, this Court referred to "the rapidly evolving state of the law regarding both medical and non-medical marijuana." ***Commonwealth v. Stone***, 273 A.3d 1163, 1171 n.9 (Pa. Super. 2022) (*en banc*) (addressing the MMA, the Controlled Substance, Drug, Device, and Cosmetic Act (35 P.S. §§

780-101–780-144), and the Driving Under the Influence statute (75 Pa.C.S. § 3802(d)(1)).[6]

Also in 2022, the Commonwealth Court affirmed the Office of Open Records' determination that a journalist was entitled to the Department of Health's "data regarding the number of patients certified to receive medical marijuana under the MMA for specific conditions."[7] ***Pennsylvania Dep't of Health v. Mahon***, 283 A.3d 929, 931 (Pa. Cmwlth. 2022) (footnote omitted). The Commonwealth Court observed that in 2019, "there were about 180,000 patient registrants in the program, and … 50.5% of those patients were certified for intractable pain[,] and [2.7%] were certified for anxiety … at that point." ***Id.*** at 936 n.13 (citations omitted).

In 2023, the same journalist wrote an article discussing the growth of "Pennsylvania's billion-dollar cannabis business," and reported that the number of Pennsylvania medical marijuana certifications had increased every year since 2017. Ed Mahon, *High Anxiety*, Spotlight PA (Jan. 31, 2023) https://www.spotlightpa.org/news/2023/01/pa-medical-marijuana-certification-card-anxiety/. The article focused on anxiety disorders as "the leading reason Pennsylvanians get a medical marijuana card." ***Id.*** It

_____

[6] It is illegal "to drive with any amount of marijuana, medical or otherwise, in one's system." ***Commonwealth v. Whitmire***, 300 A.3d 484, 490–91 (Pa. Super. 2023) (citation omitted).

[7] This Court may rely on opinions of the Commonwealth Court for persuasive value. ***See Commonwealth v. Hunt***, 220 A.3d 582, 590 n.6 (Pa. Super. 2019).

- 23 -

also reported that the "ongoing adult-use cannabis legalization debate looms over the medical program," and recognized that Governor Josh Shapiro "supports adult-use legalization" of recreational marijuana, which is legally available for recreational use in most of Pennsylvania's "neighbor states."[8] *Id.*

In 2024, a poll conducted by Franklin and Marshall College found two-thirds of Pennsylvania's registered voters believed recreational use of marijuana should be legalized. Berwood A. Yost, *Franklin & Marshall Poll Release: February 2024*, Center for Opinion Research (Feb. 1, 2024) https://www.fandmpoll.org/franklin-marshall-poll-release-february-2024/.

On May 7, 2025, the Pennsylvania House of Representatives passed House Bill (HB) 1200, the "Cannabis Health & Safety Act."[9] If enacted, HB 1200 would have legalized the purchase and recreational use of marijuana by Pennsylvanians ages 21 and older, and marijuana — like alcohol — would have been available for purchase in state stores. At 173 pages, HB 1200 contained numerous provisions. HB 1200 advanced to the Pennsylvania Senate, where it was defeated on May 13, 2025. Shortly thereafter, on May 21, 2025, a

_____

[8] We take judicial notice that recreational use of marijuana is legal in five of the six states bordering Pennsylvania (Delaware, Maryland, New Jersey, New York, and Ohio); in West Virginia, marijuana is legal for medical use.

[9] The sponsors of HB 1200, Reps. Rick Krajewski and Dan Frankel, stated that the bill was "shaped by extensive hearings and input from public health experts, criminal justice reform advocates, and small business leaders," and "offer[ed] a clear roadmap for responsible legalization." Rep. Rick Krajewski & Rep. Dan Frankel, *House passes landmark cannabis bill, moving Pennsylvania closer to safe, equitable legalization,* PA House Democrats (May 7, 2025) https://www.pahouse.com/IntheNews/NewsRelease?id=138530.

member of the Pennsylvania Senate announced that he would "soon introduce legislation to legalize adult-use cannabis in Pennsylvania, establishing a responsible framework for cultivation, distribution, and retail sales to adults aged 21 and over." Sen. Marty Flynn, *Keystone Cannabis Act Memo*, Pennsylvania State Senate (May 21, 2025) https://www.palegis.us/senate/co-sponsorship/memo?memoID=46733/. Senator Marty Flynn stated that his legislation would present "a commonsense opportunity to modernize our cannabis laws by delivering lasting economic benefits to communities across the Commonwealth while balancing individual liberty with public safety." ***Id.***

Finally, many Pennsylvanians reside in communities that have decriminalized marijuana, *i.e.*, reduced or eliminated local penalties for marijuana-related violations and/or deprioritized enforcement of existing marijuana laws. According to the non-profit National Organization for the Reform of Marijuana Laws (NORML), marijuana has been decriminalized in seventeen towns — including Bethlehem, Erie, Harrisburg, Lancaster, Philadelphia, Pittsburgh, State College, and York. *Pennsylvania Local Decriminalization*, NORML (last visited May 28, 2025) https://www.norml.org/laws/local-decriminalization/pennsylvania-local-decriminalization/.

The examples above show how the law and societal norms regarding marijuana have changed. The examples below are four of this Court's recent,

non-precedential decisions in custody cases involving a parent's marijuana use.[10]

> **Roundtree v. Smith**, No. 2390 EDA 2022 (Pa. Super. filed Apr. 19, 2023) (unpublished memorandum).

The trial court in **Roundtree** found the custody factor regarding drug abuse favored the mother, but denied the mother's request to relocate with the parties' child to North Carolina, and awarded primary physical custody to the father. On appeal, the mother claimed the court abused its discretion in considering the father's admission that he smoked marijuana.[11] **Id.** at *16. The mother also asserted that the father smoked marijuana in front of the child. **Id.** We confirmed that the father had acknowledged smoking marijuana, and testified that he smokes it "probably … every weekend." **Id.** (citation omitted). We also cited the father's testimony that he did not smoke in the child's presence. **Id.** (citations omitted). This Court explained:

> With respect to the Section 5328(a) custody factors, the trial court weighed only one in [the m]other's favor, that is, (a)(14), the history of drug or alcohol abuse of a party. **We discern no abuse of discretion by the court in not placing determinative weight on this factor.** In addition, the court included in the subject order the directive that "[n]either party is to use marijuana in the presence of the child." Order, 8/22/22, at 2. As such, [the m]other is not entitled to relief on this claim.

**Id.** at 16-17 (emphasis added).

_____

[10] Pa.R.A.P. 126(b) permits non-precedential decisions filed after May 1, 2019, to be cited for persuasive value.

[11] The father's marijuana use was presumably recreational, as there is no mention of it being prescribed or used for medical purposes.

Accordingly, we affirmed the trial court's decision, which included "not placing determinative weight" on the father's marijuana use.

*Humphrey v. Ross*, No. 174 MDA 2023 (Pa. Super. filed Aug. 24, 2023) (unpublished memorandum).

The mother in *Humphrey* appealed from the order which awarded her primary physical custody of the parties' child, but increased the father's periods of overnight custody. The mother specifically challenged the trial court's finding as "to certain best-interest factors, namely factor fourteen relating to the parties' respective past substance abuse." *Id.* at *8. She claimed that the court erred in finding that the factor was neutral. *Id.* The father had "acknowledged smoking marijuana nightly by prescription for chronic pain and explained that he also took Adderall by prescription." *Id.* at *2. The mother argued:

> [T]he court erred in equating [the f]ather's habitual consumption of marijuana and Adderall, which he currently acquires pursuant to a recently issued medical authorization and prescription, respectively, outweighs her present reliance on Adderall and evidence of her past marijuana consumption. … [S]he [claimed,] "it is unsupported by the record for the lower court to find [the father's] history of drug and alcohol abuse is not far more substantial than that of [the mother]."

*Id.* at *8.

This Court rejected the mother's argument. We explained that the trial court found factor fourteen to be neutral given the father's "progress in counseling," and "legitimate prescriptions for medical marijuana and Adderall." *Id.* at *7 (citations omitted). Further, "notwithstanding [the

f]ather's past substance abuse, his current reliance on prescribed medication [wa]s not a detriment to [the child's] best interest." *Id.* at *8. We stated that the mother's "difference of opinion is not an abuse of discretion," and added that we would not "reassess the weight of the evidence." *Id.* at 9. In sum, we affirmed the custody order where the trial court considered both parties' marijuana and Adderall use to be neutral.

> *Williams v. Williams*, No. 2528 EDA 2023 (Pa. Super. filed Oct. 16, 2024) (unpublished memorandum).

The father in *Williams*, an assistant high school principal, appealed from the order awarding the mother primary physical custody of the parties' children. Among his claims, the father argued that the trial court improperly credited evidence of his marijuana use in its consideration of the custody factors. The mother's father (the grandfather) had testified "that he observed [the f]ather smoking marijuana at least once." *Id.* at *23. The father argued that the court should have discredited the grandfather's testimony because of the grandfather's beliefs about COVID-19. The trial court explained that it credited the grandfather's testimony because the mother also testified about the father's "smoking marijuana on the deck at the marital residence and stuffing marijuana leaves in the basement rafters." *Id.* (citation omitted). This Court explained that "this evidence was significant for the [trial] court's assessment of Section 5328(a)(14)." *Id.* at 23-24. We quoted the court's statement that, "[a]lthough [the court] did not weigh [marijuana use] heavily against [the f]ather at this time," the court "did weigh this factor against [him

- 28 -

because h]e is the only party on this record for whom there is evidence of substance abuse." *Id.* at 24 (citation omitted). This Court found no error in the trial court's weighing of the father's marijuana use against him, "although … not … heavily," in affirming the custody order.

> *J.B. v. M.D.*, No. 1099 WDA 2024 (Pa. Super. filed Mar. 4, 2025) (unpublished memorandum).

In another relocation case, *J.B.*, the trial court denied the mother's request to relocate with the parties' child to New York. The court entered an order denying relocation, but granted the mother primary physical custody of the child five days a week in Pennsylvania, with the father having partial physical custody of the child two days a week. *Id.* at *11. On appeal, the mother raised numerous issues asserting that the trial court's findings were contrary to the record. *Id.* at *13. Regarding the father's marijuana use:

> [The m]other [claimed] the record "unequivocally support[ed] the conclusion that [the f]ather's regular illegal drug use does put the [c]hild at substantial risk of harm," contrary to the trial court's finding that [the f]ather's marijuana use poses no danger to [the c]hild. [The m]other assert[ed] the trial court erred in "fail[ing] to give 'weighted consideration' to" this factor, which implicates [the c]hild's safety…. [A]t the custody trial, [the f]ather testified "a) he smokes marijuana at least 5 times per week, b) he does not possess a medical marijuana license, [and] c) [he] smokes marijuana while exercising custody" of [the c]hild. According to [the m]other, "[i]n finding that [the f]ather's admitted drug use does not pose a danger to the [c]hild, the trial court could not have made a further departure from the 'best interest of the child' standard [applicable] in all custody cases."

*Id.* at *14-15 (citations omitted).

The father in *J.B.* testified that he smoked marijuana but did not have a medical marijuana license. *Id.* at *7 (citation omitted). The father "stated that he purchases it legally in New York," and testified that the parties' child was unaware of his marijuana use. *Id.* (citations omitted).

In considering the parties' drug and alcohol use, the trial court noted that the mother had "voluntarily sought treatment for problems related to alcohol" and "continues to consume alcohol in moderation." *Id.* at *28. The court added that the father "asserts th[e m]other continues to have a drinking problem, but he failed to provide credible evidence from the time when he moved out of the family residence." *Id.* As to the father, the court stated:

> [The f]ather regularly uses marijuana, but he does not possess a medical marijuana [license]. The [c]ourt does not find that [the f]ather's [marijuana] use poses a danger to [the c]hild.

*Id.* (citation omitted). In affirming the trial court, this Court concluded that the evidence supported the court's findings and determinations regarding the custody factors — including the court's determination that the father's marijuana use did not pose a danger to the child. *Id.* at *32.

Here, our disposition is consistent with the cases summarized above. It is also consistent with evolving law and societal norms.

## Conclusion

A trial court must decide custody on a case-by-case basis, and determine the child's best interest after considering all sixteen statutory factors. The parties' drug and alcohol abuse is one of sixteen factors. It is

the trial court's function to weigh all of the factors and determine which are most important.

In this case, the trial court recognized both parties' marijuana use, and found the factor concerning drug and alcohol abuse to be neutral in the court's consideration of Children's best interest. The court noted Mother's history of using marijuana, and her testimony that she had done so with Father. *See* TCO II at 6. The court also noted that Mother knew Father used marijuana when she agreed to him having primary physical custody of Children. *Id.* Thus, the court concluded Mother could not "complain about [Father's marijuana] use when she has used, condoned and accepted the same for over four (4) years." *Id.* This conclusion was not unreasonable. The court properly considered the statutory custody factors in denying Mother's petition to modify physical custody. Accordingly, the court did not err or abuse its discretion in deciding that continuation of the existing custody schedule was in Children's best interest.

Order affirmed.

Judges Bowes and Olson concur in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 07/10/2025

- 31 -